MATTESON *v.* WEAVER.

1. CANCELLATION OF INSTRUMENTS—STOCK SUBSCRIPTIONS—FRAUD —EVIDENCE—SUFFICIENCY.

   In a suit for the cancellation of stock subscriptions and notes on the ground of fraud, evidence *held*, sufficient to justify the conclusion of the court below that plaintiffs' signatures were procured by fraud.[1]

2. CONTRACTS—NAKED PROMISES MAY BE CONSIDERED IN CONNECTION WITH FRAUD.

   Although naked promises are not misrepresentations of existing facts and of themselves do not constitute fraud, yet where made in bad faith with no present intent to perform, and as part of the scheme to defraud, they may be considered by the court on the question of fraud.[2]

3. FRAUD — DEFENSES—PERPETRATOR OF FRAUD MAY NOT CLAIM VICTIM TOO CREDULOUS.

   It does not lie with the perpetrator of a fraud to say that his victim was too credulous, and reposed too much confidence in those with whom he dealt and who assumed to have superior knowledge of the subject upon which they spoke.[3]

[1]Cancellation of Instruments, 9 C. J. § 195; [2]Contracts, 13 C. J. §§ 285 (1926 Anno), 963; [3]Frand, 26 C. J. §66.

4. CORPORATIONS—ESTOPPEL—FRAUD.

In a suit for the cancellation of stock subscriptions and notes because of false representations of defendants, the fact that some of the plaintiffs permitted themselves to be held out to prospective purchasers of stock as directors in the company and wrote letters commending the enterprise, *held*, not to work an estoppel in favor of defendants.[4]

5. SAME—FRAUD—DISTRIBUTION OF ASSETS.

Where the court found that plaintiffs' stock subscriptions and notes were procured by defendants' fraud, they should be canceled as far as defendants' claim is concerned, but as to other subscribers who have paid cash, the case is remanded for such proceedings as may be deemed necessary, before the assets are distributed, with power to appoint a receiver if deemed proper.[5]

Appeal from Muskegon; Vanderwerp (John), J. Submitted October 22, 1924. (Docket No. 125.) Decided December 31, 1924.

Bill by Jesse O. Matteson and others against Charles S. Weaver and others for the cancellation of stock subscriptions on the ground of fraud in their procurement. From a decree for plaintiffs, defendants appeal. Modified and affirmed.

*Joseph T. Riley* (*Lovelace & Broek*, of counsel), for plaintiffs.

*Laurence W. Smith*, for defendants.

FELLOWS, J. Defendant Charles S. Weaver perfected a so-called "common-law trust," to hold certain oil leases and develop supposed oil properties. It was organized in Chicago, Illinois. It is intimated that such trusts fell under the ban in Illinois and defendant came to Muskegon, where he had formerly resided, to sell shares or units in it. Possibly it was then supposed that such transactions were not inhibited by

[4]Corporations, 14 C. J. § 867; [5]Id., 14 C. J. § 866.

the so-called "blue sky law" (3 Comp. Laws 1915, § 11945 *et seq.*) although in this the parties were mistaken (*People* v. *Clum,* 213 Mich. 651 [15 A. L. R. 253] ).   No relief is asked, however, in this case by reason of the violation of the blue sky law.   Quite a number of shares or units were disposed of at Muskegon and some of the substantial citizens there invested in them.   Later it was claimed by Weaver that considerable more money would be needed to develop the properties and it was understood that a corporation should be organized under the laws of this State to succeed to and take over the properties held by the trust.   Plaintiffs signed subscriptions for additional stock in the corporation beyond the amount they would receive on dissolution of the trust and gave their notes in varying amounts.   It is their claim that such subscriptions and notes were procured by false representations by defendant and his agents and they file this bill to cancel their subscriptions and notes.   Other parties intervened and upon a hearing the trial judge found the facts as claimed by the plaintiffs and entered a decree in their favor, to some of the details of which we shall presently refer.

We agree with the conclusion of the trial judge that plaintiffs' signatures were procured by fraud.   Defendant brought to Muskegon two sales agents from Chicago who actively assisted him in making sales of stock in the proposed corporation.   They, as well as defendant, made statements of material facts which were relied upon by plaintiffs which the proofs establish were untrue.   We are convinced that plaintiffs relied on these statements, most of which were made by defendant himself or in his presence.   It was represented to plaintiffs that the properties held by the trust and which were to be turned into the corporation were beyond the speculative period and that it was a pure matter of business to develop them;

it was represented that but a short distance from the line of the so-called Jennings property held under one of the leases was located the Hammond well and that it was producing 1,000 barrels a day and Mr. Weaver composed and had printed in two oil papers published in Texas an article commenting on that production of the Hammond well and conveying the impression to the ordinary reader that a well had been brought in on the Jennings property equally as good as the Hammond well or better. Copies of this paper were sent to the plaintiffs and others in Muskegon. As a matter of fact the Hammond well was not a large producer and no well had been brought in on the Jennings property and the property was not beyond the speculative period. The field where the Jennings property was located was not of the productive capacity represented by defendant and many representations appearing in the literature circulated were untrue. We are also persuaded that defendant misrepresented to or concealed from plaintiffs the number of shares he held in the trust which would be exchanged for stock in the corporation and withheld from them for some time the true financial condition of the trust.

There were also statements made having reference to the future which may be termed promissory, such as the statement of one of the sales agents that he intended to put a large amount of money into the enterprise, and the statement of defendant that plaintiffs would not be called upon to pay their notes as he would simply use them as collateral to secure the funds necessary for drilling and the dividends before they were due would more than pay them. While these were promissory in character they could not have been made in good faith and were but a part of the scheme to defraud. Naked promises are not misrepresentations of existing facts and of themselves do not constitute fraud. *Boston Piano & Music Co. v. Pontiac Clothing Co.,* 199 Mich. 141. But where

a promise is made in bad faith with no present intent to perform it, and it dovetails into and forms a part of the scheme to defraud, it may be considered by the court.    *McDonald* v. *Smith*, 139 ` Mich. 211; *Barker* v. *Finley*, 200 Mich. 166; *Kefuss* v. *Whitley*, 220 Mich. 67.

Plaintiffs were business men of Muskegon.    Possibly they ought not to have been caught by this scheme.    But the industry of buying gold bricks is not confined to the agrarian population.    It was represented to them that the properties had reached that stage where it was no longer a speculative proposition but a pure business deal.    This court has frequently held that it does not lie with the perpetrator of a fraud to say that his victim was too credulous, and reposed too much confidence in those with whom he dealt and who assumed to have superior knowledge of the subject upon which they spoke.    *Eaton* v. *Winnie*, 20 Mich. 156 (4 Am. Rep. 377); *John Schweyer & Co.* v. *Mellon*, 196 Mich. 590; *Smith* v. *Werkheiser*, 152 Mich. 177 (15 L. R. A. [N. S.] 1092, 125 Am. St. Rep. 406); *Miller* v. *Savings Bank*, 227 Mich. 316; *Smith* v. *McDonald*, 139 Mich. 225.

Some of the plaintiffs permitted themselves to be held out to prospective purchasers of stock as directors in the new company and some of them wrote letters commending the enterprise and these letters were also used by the salesmen.    This did not work an estoppel in favor of defendants, and we can not upon this record determine whether it did as to any of the purchasers of stock, or whether the equities of plaintiffs' or any of them should be postponed to those of others who purchased stock.    This leads us to the form of the decree to which we have before adverted.

The decree provided that the subscriptions and notes given by the plaintiffs and those who had intervened should be set aside and held for naught and that all such subscriptions and notes and all moneys

and other assets arising from stock subscriptions be surrendered within twenty days and in default that a receiver be appointed and jurisdiction was retained by the court to make such further decree as might be necessary.    It is quite probable that the trial judge had in mind the same thing we have in mind, but we think it should be made more definite.    The subscriptions and notes of plaintiffs and interveners should be canceled as far as defendants' claim is concerned.    Whether they should be canceled as to other subscribers who have paid cash, we can not determine on this record.    All subscribers should be given notice and be heard before the assets are distributed or the notes and subscriptions canceled.    If the trial judge deems it proper to appoint a receiver he may do so.

The decree will be modified as herein indicated and the case remanded to the trial court for such proceedings as may be deemed necessary and which are not inconsistent with this opinion.    As this modification is not in the interest of defendants, plaintiffs will have costs of this court.

CLARK, C. J., and MCDONALD, BIRD, SHARPE, MOORE, STEERE, and WIEST, JJ., concurred.